CITED *in Miller* ads. *Pancoast,* 5 *Dutch.* 253; *Moore* v. *Bonnell,* 2 *Vr.* 97;
*Parr* v. *Brady,* 8 *Vr.* 203; *Field* v. *Post,* 9 *Vr.* 348; *Knapp* v. *Hoboken,*
*Id.* 373; *Hutcheson* v. *Peshine,* 1 *C. E. Gr.* 173.

## ENOCH DURAR v. THE HUDSON COUNTY MUTUAL INSUR-ANCE COMPANY.

1. The assent to the assignment of a policy of insurance given by the secre-
tary, or other agent of the directors, of an insurance company for that purpose,
is the assent of the directors.

2. Where the charter of an insurance company requires the assignee of a
policy to give *satisfactory security* for the residue of the premium note, it is
not necessary that he should give his own note; leaving the note of the as-
signee, if that is *satisfactory,* is sufficient.

3. Where the directors of a company, after an act has been done by an
agent of the company, and entered upon their books, acquiesce in such act,
and proceed in the premises as if it were done by them, they shall be bound
by it, even if the agent had not authority at the time for the transaction.

This was a suit brought by the plaintiff against the defend-
ants, who were a mutual insurance company, for a loss by

fire, and was founded on a policy, effected with the defendants by one William J. Cantelo, upon buildings, &c., on lands which he subsequently sold to the plaintiff, to whom it was alleged he assigned the policy, with the assent of the defendants.

The cause was tried before the CHIEF JUSTICE, at the Hudson circuit, in April, 1852, when the jury found, by a special verdict, the following facts:

That, on the 29th day of June, 1843, William J. Cantelo made application to the defendants to be insured on certain property described in the application, which is partly printed and partly in writing; that he asked to be insured in the sum of twenty-three hundred dollars for the term of five years.

That, in pursuance of such application, the defendants agreed to insure the said W. J. C. for the said sum of twenty-three hundred dollars, that is to say, eighteen hundred dollars on a two story frame building, and five hundred dollars on his machinery for rearing, hatching, and reeling silk worms, as contained in said building; and thereupon a policy of insurance, of the form prescribed and adopted by said defendants, was made out and duly executed and delivered to the said W. J. C.; bearing date on the said twenty-ninth day of June, in the year aforesaid; and the said W. J. C., at the same time, executed and gave to said defendants his premium note for four hundred and sixty dollars.

That the said William J. Cantelo, being in possession of the property insured, on the 2d day of October, 1844, sold and conveyed the premises in which the said building was situate, and in which building was the machinery referred to in said policy, by deed of bargain and sale, to Enoch Durar, the plaintiff, for the consideration of three thousand five hundred dollars, as expressed in said deed, which deed was duly acknowledged by said W. J. C. and his wife, and afterwards recorded in the clerk's office; and that the said deed was prepared under the direction of Edwin R. V. Wright, who acted as the agent, and was the agent of Enoch Durar, the plaintiff, who resided in the city of Philadelphia.

That, as such agent, he received from said W. J. C., at the

time said deed was executed, the policy of insurance above mentioned, together with two other policies of insurance, given by the said defendants to said Cantelo on other portions of the property conveyed (numbered 122, 123.)

That the said agent proceeded, on the 23d day of October, 1844, to the office of the said company, the defendants; that he found there Stephen H. Lutkins, the secretary of the company, who is now deceased, and informed him that W. J. C. had sold his property which was insured in that office to Enoch Durar, of Philadelphia, and that he wanted to have the insurance continued to him; that the said secretary informed him an assignment of the policy was necessary, and the consent of the company must be endorsed on the policy. The assignment had been made and executed, and the agent thereupon filled up the consent which was printed in blank on the policy, and the secretary then signed the consent in presence of the agent. The agent then asked the secretary if he required any thing more of the plaintiff to have him fully insured, and he answered no. On leaving, the agent inquired of the secretary if the plaintiff was fully insured, and the secretary answered yes, and thereupon the agent left him; that the plaintiff went into possession of the property, and Mr. C. continued in as tenant of the plaintiff; that the personal property on the place was assigned over at the same time from W. J. C. to Enoch Durar. It was not the machinery and property mentioned in the policy. The assignment of the policy was on the same day that the agent was at the secretary's office; none of the directors of the company were there, and the agent was there but once about the assignment; the office was in the secretary's house. After the fire, the other policies of insurance were discontinued upon notice from the company; that the deed was executed in presence of the said agent, on the 22d or 23d day of October, 1844, and acknowledged on the 24th of same month; the sale was an absolute sale.

That the fire which consumed the property occurred on the 6th day of September, 1845, about ten o'clock on Saturday night, and the building and machinery were totally destroyed.

There were four thousand ducks in the establishment, and they were all burned.

That, after the said assignment, and about August 16th, 1845, there was a notice addressed to W. J. C. by the defendants, requesting him to pay the sum of fifteen dollars and thirty cents for a loss occasioned by some fire which had occurred to property insured by the defendants; that the said W. J. C. wrote on to the plaintiff, in Philadelphia, who sent him a draft for the amount, which he paid to John Garretson, the treasurer of defendants, and took his receipt. There were three different policies, and their numbers were on the receipt.

That after said assignment, Abraham L. Van Buskirk, a member and officer of the said company, applied to said W. J. C. to use his influence with the plaintiff to authorize Selah Hill to vote in his place and on his behalf at the ensuing election for directors and officers of the company, and gave him the form of a proxy; that the said W. J. C. thereupon wrote to the said plaintiff, and enclosed in the form of a proxy to vote, in a letter dated 20th February, 1845; that the said plaintiff sent on a power of attorney authorizing Selah Hill to vote in his behalf, which went into the hands of said Van Buskirk.

That John Garretson was treasurer of the defendants in 1845; there was an assessment made that year to pay a loss on a fire which took place the latter part of July, or first of August, 1845; the assessment was made about three weeks after; that the said treasurer called on W. J. C., jun., who was then occupying the property of the plaintiff, for an assessment; that the said W. J. C., jun., informed the said treasurer he would write to Mr. Durar about it, and soon after he paid over the amount of the assessment. The secretary of the company furnished to the treasurer the lists to make out the assessments, and the treasurer paid over the money so received from the assessments to the person who had lost by the fire; that a day or two after the burning of Mr. Durar's building, the board of directors appointed a committee to go up and view the premises; the committee consisted of J. D. V., Mr. S., Mr.

T., and the treasurer. Before the appointment of this committee, the board had received notice of the fire from the plaintiff.

And the jurors aforesaid, on their oaths aforesaid, further say, that the list to make out the assessment was furnished to the treasurer by P. B., the secretary of the company, whose business it was to make out the list, and that the premium notes were not handed to the treasurer; that P. B. was appointed secretary after Stephen H. Lutkins went out, and that the board of directors had nothing to do with making out the list; that the said treasurer was a director, and did not know any thing about the notes; that the committee to go and view the premises after the fire was not appointed at an ordinary meeting of the board; that when an assessment is to be made, the directors settle the rate per cent. to. be paid, and for this purpose they have the amount of the premium notes before them: the secretary makes a report quarterly of the amount of the notes and the amount insured; the books show the amount of the premium notes, and who gave the notes; that the board met quarterly: and it was usual for the secretary, as the agent of the company, to give and endorse the assent in the assignment of policies; that it was customary for the secretary to report transfers of policies to the president of the board, and not to the board.

That the notice before spoken of was directed to W. J. C. by the treasurer, and that the treasurer did not know of the sale and transfer of the property by Cantelo to Durar; that he did not know any thing about the note but by the secretary's report; that he was in the habit of attending the regular meetings of the board of directors; that he had never seen the note of W. J. C., and all he knew of it was that it was on his list; that the board, as such, does not issue the policies of insurance, the president and secretary do that business; that in the report of premium notes made to the board the amount only is given; that the board, as such, did not formally approve the premium notes, that is done by the president and secretary.

That notice of the loss was given to the company, by W. J. C., on Monday next after the fire; that E. R. V. W., the

agent of the plaintiff, prepared the preliminary proofs, and had them sworn to by the plaintiff, and then delivered them to the president of the company, who then informed the agent that he had received notice of the fire, and the papers were delivered by him to the secretary; that shortly after the president of the company called on the said agent to furnish them the bill of particulars and evidences of the amount of the loss; they then required the evidences of the costs of the building, all which were furnished, and were kept some time, and then returned to the agent; that the agent had several interviews with the said president in relation to this matter; they were not willing to pay the whole; that Paper No. 1, and dated September 8, 1845, is a statement of the loss, as sworn to by the plaintiff; that Paper No. 2 is a statement of particulars of property destroyed by fire, dated September 8, 1845; that Paper No. 3, dated September 8, 1845, and certifying the loss, was signed by John Ehlere, who was one of the nearest neighbors; that he owned property then, and was a reputable and disinterested man; that about a week after the delivery of those papers, the company called on the agent for the others; there were three policies assigned at the same time; about new year, 1846, the president of the company certified to inform the plaintiff to come and give additional security on two of the policies, or the company would cancel them; that the agent wrote to plaintiff about it on the 9th of January, and advised him to let the company forfeit those policies; John Ehlere held a mortgage on this property given before the building was erected.

And the jurors aforesaid, on their oaths aforesaid, further find, that Selah Hill, who was a member of said insurance company in 1845, and voted in March of that year at an election for directors on the proxy of the plaintiff; he voted on this proxy at two different elections, holden about the same time, the first having been set aside; he had a number of proxies, seventy or eighty of them, and voted on them all at same time; the elections were held by persons not directors, and no scrutiny made as to the right to vote on the share represented, nor any objection to his right to vote; the proxies

were all handed to the inspectors, and they examined the books to see how many votes each person was entitled to; from that inspection the voters ascertained the number of votes they were entitled to, and then made up their votes; Stephen H. Lutkins was the secretary of the company at that time, and the proxies were not left with the company; that the said S. H. was entitled to four votes by reason of said proxy, and he, Hill, knew the proxy was sent from Philadelphia; the election was a warm one, a good many persons there; there were several directors there, and every one voted that had a right to vote; the inspectors examined such books as were necessary to ascertain how the members were entitled to vote.

And the jurors aforesaid, on their oaths aforesaid, further find, that the cancellations of policies 121 and 122, on the company's books (*pro ut* the said books) are in the handwriting of L. D. H., the present secretary of the company, and that the cancellation was made after November, 1845, by order of the board; that the company was incorporated on the 11th day of February, 1842, (*pro ut* the charter), which, among other things, enacts as follows:

SEC. 4. *And be it enacted*, That the board of directors may appoint a secretary and such other officers and agents as may be requisite for effecting the business of said company, and allow them such compensation as they may deem reasonable, and also determine the rates of insurance.

SEC. 5. *And be it enacted*, That all policies, and contracts founded thereon, which shall be made or entered into by the said company, may be made either under or without the seal thereof, and shall be subscribed by the president and attested by the secretary, and, being so subscribed and attested, shall be binding and obligatory upon the said company; and the said company shall be liable for all loss or damage sustained by fire or other casualty, agreeably to and on such terms and conditions as shall be contained in the policy.

SEC. 6. *And be it enacted*, That every person who shall become a member of said company, by effecting insurance therein, shall, before he receives his policy, deposit his promissory

note for such a sum of money as shall be determined by the directors to be the premium for said insurance; a part not exceeding five per cent. of said note, shall be immediately paid, and the remainder of the said deposit note shall be payable, in part or the whole, at any time when the directors shall deem the same requisite for the payment of loss or damage by fire and such incidental expenses as shall be necessary for transacting the business of said company; but no member shall be held liable beyond the amount of his, her, or their promissory note; and at the expiration of the term of insurance, the said note, or such part of the same as shall remain unpaid after deducting a just and fair proportion of all losses and expenses occurring during said term, shall be relinquished and given up to the maker thereof; and it shall be lawful for said corporation to loan such portion of their money in hand as may not be immediately wanted for the purposes of said corporation, to be secured by mortgage on unencumbered real estate, in the county of Hudson, of double the value of the sum loaned.

SEC. 7. *And be it enacted,* That when any property insured by the said company shall be alienated, by sale or otherwise, the policy shall thereupon be void, and be surrendered to the directors of said company to be cancelled; and upon such surrender the insured shall be entitled to receive his deposit notes, upon the payment of his proportion of all losses and expenses that have accrued prior to such surrender; but the grantee or alienee having the policy assigned to him may have the same ratified and confirmed to him, for his own proper use and benefit, upon application to the directors and with their consent, within thirty days next after such alienation, on giving proper security, to the satisfaction of said directors, for such portion of the deposit or premium note as shall remain unpaid; and by such ratification and confirmation, the party causing such security to be given shall be entitled to all the rights and privileges, and subject to all the liabilities to which the original party to whom the policy issued, was entitled and subjected to under this act.

SEC. 10. *And be it enacted,* That no transfer of any policy

of insurance of said company shall be valid until entered into the books of said company and certified on the policy by the secretary.

That the company made sundry by-laws, among which are the following:

ART. 8. For the mutual benefit and security of all parties, this company deem it necessary and proper, and do accordingly hereby expressly reserve to themselves the right and privilege, at their option, to terminate any risk they may have taken, after five days' notice to the maker, or his, her, or their legal representative, of any premium note the company may have received, if he, she, or they shall refuse to make the said note entirely satisfactory to the board, by placing in the hands of the company such additional security as will satisfy them that the said note, or such amount as may be assessed thereon, will be promptly paid when demanded: in such case a *pro rata* share of the premium received and the premium note will be returned.

ART. 9. Every policy of insurance made by this company shall be signed by the president and secretary, and the person for whose interest the insurance is made must be declared and named therein; nor can any policy or interest therein be assigned but by the consent of the company expressed by endorsement made thereon, as herein after provided; and in case of assignment without such consent, whether of the whole policy or of any interest in it, the liability of the company by virtue of such policy shall thenceforth cease.

ART. 14. Whenever any member of this company shall alienate or sell any house or building insured, he may surrender his policy to the secretary, with a request to have the same cancelled, to take effect the day the same shall be received by him, upon the payment of his proportion of all losses and expenses that have accrued prior to such surrender: and in case one building only is alienated or sold where others are contained in the same policy, said policy may be surrendered as to that building only, and to take effect on the day it shall be received by the secretary; and the amount of premium on the said building so sold shall be endorsed after thirty days

from the surrender on said member's premium note, or such portion thereof as shall not have been paid or expended; *provided further*, that whenever the grantee or alienee shall procure an assignment and transfer of a policy, where he shall have purchased the whole property insured, and shall, within thirty days from the day he purchased the same, present the said policy and assignment to the secretary, he may have the same confirmed and ratified to him: and when the said assignment shall be approved by the directors, the secretary shall record the same, and the confirmation thereof, by order of said directors, when said grantee or alienee shall have given satisfactory security for the payment of the residue of the premium given for said policy.

ART. 17. In all cases of loss the company reserve the right of retaining out of the amount of said loss the amount of the original deposit or premium note, or any portion thereof, until the expiration of the term for which said policy was granted, unless the claimant shall give satisfactory security to the company for the payment of any assessment which shall be made upon said note, or upon the original assured, for losses during the terms for which said policy was granted; and in case of an assessment to meet any loss or damage, the premium notes only of the members that composed the company at the date of said loss or damage shall be subject to such assessment.

ART. 18. When buildings insured by this company shall have become mortgaged, the mortgagee may have the policy assigned to him as collateral security to said mortgage, subject, however, to the original deposit note and the requirements contained in the eighth article: the secretary, when application shall be made to him, shall be authorized to give the assent of the said assignment, subject to the conditions and reservations aforesaid, and not otherwise; which assent shall be endorsed upon the said policy, signed by the secretary, who shall enter the same on the record of said policy.

That P. Bently was secretary of the company for six months, from April to November, 1845; that J. G. Speer was employed by him to come to his office, and was handed the register to make out the list of persons to be assessed. The

said secretary being occupied at the time, his attention was not called to the note of Mr. Cantelo, or any other person, and did not know that Mr. Durar had any interest in it at that time; it was the uniform practice, when property had been alienated, for the assignee of the policy to give his own note, if the matter came to the knowledge of the board; upon alienation, the parties alienating property have left their notes, and sometimes take them away: the form of a note is attached to the application.

That in cases of assigning policies to mortgagees for security, the secretary was authorized by the by-laws to do it, and without taking a new note, the old one being considered safe; the course was for the secretary to endorse the consent on the policy, and to make an entry in the *register*, which was always open to the board, and no other report was made to the board of directors; that the secretary has no recollection of a vote of approval of the assignment of a mortgage ever being taken by the board; the entry in margin of register book, opposite to No. 226, is the same as was usually made on assignment of policies to mortgagees; transfers always entered in the book of register; that the proceedings in case of mortgages were conducted according to article eighteen of by-laws; that the said secretary has never known, since the year eighteen hundred and forty-five, any transfer of policy to an alience without a new note; the stated meetings were once every three months, but they had extra meetings; the secretary did all the ordinary business; he made out the policies, and would send them to the president, who would sign them in all ordinary cases.

That the committee of finance, on or about the fourteenth day of April, made a report to the board, which is as follows:

The committee on finance beg leave to make the following report: They have examined all the premium notes belonging to the company, and find that Robert Johnson, Adolphus Williams, Job Seeley, Darius Young, Benjamin Fillapitte, William J. Cantelo (on 3 policies), and A. F. Harrison are, in the opinion of your committee, insured too high: your committee would therefore recommend that a survey be made by the

surveyor, and recorded on the books of the company. Your committee also find that Ann Bedford has given her note instead of her husband; also Mrs. Champion, instead of her husband; also Joseph Spies' note by his brother; also Clara R. Cobb by her attorney Lewis B. Cobb; also Baldwin & Flynee's note by Baldwin, which your committee think are not legal notes; also, Bergen Building and Trading Company's note by their president; said company is not chartered, but merely an association; also security required on Charles Gardner's note, and James C. Williamson's house described as being in Van Vorst township in his application, but is actually built in the township of Jersey City. All of which is respectfully submitted to the consideration of the board.

Dated Jersey City, April 14th, 1848.

The special verdict further found the plaintiff's damages to be $3199.68.

The argument was had upon a motion for judgment for plaintiff upon the special verdict before the CHIEF JUSTICE and Justices OGDEN and HAINES.

Mr. *Vroom* and Mr. *Zabriskie* for plaintiff, Mr. *Pennington* and Mr. *Whitehead* for defendants.

Mr. *Vroom*, for plaintiff.

The prominent facts of the case, as found by the verdict, are—That the insurance was effected by W. J. Cantelo, in June, 1843, upon the property then owned by him, $1800 on the buildings and $500 on the machinery, the defendants being a company on the mutual principle. Cantelo, on the 22d of October, 1844, sold to the plaintiff, who resided in Philadelphia, for $3500, but remained in possession. The agent of the plaintiff, who prepared the deed and conducted the business on his part, on the 23d of October, 1844, went to the office of the company with the assignment transferred to plaintiff. He found there the secretary of the company; he informed him of the sale and transfer, and that plaintiff desired to have the insurance continued, for which purpose he brought the policy. The secretary informed him that it was necessary to have the

policy assigned and the consent of the company endorsed. The assignment being endorsed, the secretary filled up the printed consent upon the policy and signed it as secretary and agent of the company, and told the agent of the plaintiff that he was fully insured, that nothing further was necessary.

After this, Cantelo went to Europe, and the plaintiff took possession of the property. On the 6th of September, 1845, it was destroyed by fire. On Monday, September 8th, the notice and preliminary proofs were furnished, after which the company called for bills and more particular evidence of the amount of the loss.

The only questions now submitted are questions of law; the jury have determined the amount, and there is no question of apportionment.

Was the plaintiff a member of the company, so as to entitle him to an indemnity for loss? This is the great question in the cause. There is no objection to the validity of the original insurance.

There was a *bona fide* sale of the property for consideration, an actual and formal transfer of the policy by Cantelo, and the assent of the secretary of the company. There is no difficulty from the common law doctrine of assignment of choses in action, for the 7th section of the charter and the 14th article of the by-laws provide for and authorize it.

The assent of the company was given by the secretary, who was their agent for that purpose; the board met only quarterly, and it was usual for the secretary to assent to all transfers; it was an authority which the board could delegate, and which he exercised with their knowlege. There is no conflict in this with their charter; they are authorized, by section 4, to appoint agents to transact the business of the company.

The 4th article of the by-laws specifies the duty of the secretary; he is to perform the duties prescribed by the directors. It is immaterial whether these duties are prescribed in writing, by parol, or by implication from the course of business. The secretary was the great agent of the company for all the business of insurance. His signature to the consent to

transfer is *prima facie* evidence of the assent of the board. 8 *Pick.* 56, *New England Insurance Co.* v. *De Wolf.*

The special verdict finds that the assent of the company was given and recorded. The register contains the entry of the insurance. In the margin of this registry is the following entry by the secretary: " Permitted to assign to Edward Durar, of Philadelphia, 23 Oct. 1844." This record is evidence of approval by the directors of this assignment. It is the usual entry, and it is immaterial whether the company authorized their secretary to make such entry.

It is objected that Durar gave no note; that the seventh section of the charter requires security to be given; that it is a mutual company, and with Durar there was no mutuality, for he was not bound to contribute; that the charter expressly avoids policies upon alienation, but allows them to be confirmed on security only. But the meaning of this section is that the alienee shall not have any right, unless he give such security as the company require. Does it mean that if they expressly say they demand no further security the assignee cannot be a member? There was an implied undertaking on the part of Durar to pay the assessments on this note; he did pay them, and undertook to become responsible for the amount due on this note. This is the unavoidable conclusion in law from the facts of the case.

Durar so considered it; the company so considered it: he acted as a member; they treated him as such by most unequivocal acts.

They assessed this note, and took his money; the assessment was in August, the payment September 19, 1845, thirteen days after this fire, and after Durar's claim was put in for payment of this loss. By article 17 of by-laws, only notes of members can be assessed.

The committee of finance, in April, 1845, reported to the board upon this as an existing policy, that the amount insured by it was too great.

After the fire, when he called for payment, they appointed committee, and asked for particulars of loss.

Durar voted by proxy; the other members were present in

person or by proxy. The election was set aside, and a new one ordered; his proxy was used at both, after the scrutiny into the first election.

After this, in 1846, they called for further security upon the two other policies, transferred at the same time and part of the same transaction, and formally annulled his other policies for want of such security.

These facts clearly show existing membership of Durar and his legal liability. 8 *Wheat.* 363, *Fleckner* v. *Bank of N. E.*

The case of *Smith* v. *The Saratoga Insurance Co.*, 3 *Hill* 508, is relied upon as authority against us. But the charter in that case declared the policy void, unless the assignment was by consent in writing, and it did not appear that any assessment was made after the assignment. The case of *Neavie* v. *Onondaga Co. Mut. Ins. Co.*, 7 *Hill* 49, does not affect the question; it merely holds that an assessment on a note does not admit the validity of the policy.

The important question is as to the power of the agent. *Ang. & Ames on Corp.* 215 216; 2 *Fairfield* 225, *Trot* v. *Warren;* 7 *Cranch* 299, *Bank of Columbia* v. *Patterson;* 12 *Wheat.* 64, *Bank of U. S.* v. *Dandridge;* 12 *Pick.* 270, *Hayward* v. *The Pilgrim Society;* 4 *Cowen* 645, *Perkins* v. *Wash. Ins. Co.*

Mr. *Pennington,* contra.

These questions have already been decided upon this very insurance policy. A suit was brought by Durar for this claim in the Circuit Court of the United States for this district. The declaration omitted to set forth the confirmation of the assignment by the directors; it was demurred to on that ground, and the demurrer was sustained. The declaration was amended; and upon the trial they failed to prove the confirmation by the directors; the proof was, with some variations, substantially the same as here. The court charged that the policy was void; the jury found a verdict for the plaintiff against the charge, which the court, of its own motion, instantly set aside. The plaintiff then discontinued that suit, and brought his suit here.

The court must, in considering this question, keep in mind

that the assignment is one thing, and the confirmation of that assignment and the acceptance of security is another and very different matter.

The *assignment* was consummated October 23d, and consent of the secretary was endorsed. The entry in the book is not that assignment is "ratified," but "permitted to assign." The secretary truly said that no further act was necessary to complete *assignment.*

The 7th section of the charter, which declares the policy void upon sale in its proviso, requires not only that the policy must be *assigned,* but that assignment must be *approved* and *security given.* The directors themselves cannot confirm the policy, unless upon security. This act is a public act, and every corporator must be held to know this provision of it. There was no such power expressly delegated to the secretary, and no one instance of his having exercised it.

By article 18 of by-laws, where the policy was transferred to a mortgagee, and the mortgagor's note was held, the transfer was authorized.

It is said that Cantelo's note was left. But did he agree to it? Was it not void? and could the company have recovered against Durar in case of loss? Unless the court hold that an action could be maintained against Durar on his note, there is no mutuality, no consideration for this contract of confirmation.

Judge Grier's view was that the law required security to be given; that it was not given; therefore Durar failed to establish his claim to indemnity. This charter is a mere copy of the mutual insurance charter in the state of New York, and the decisions there sustain our positions. 1 *Hill* 499, *Smith* v. *Saratoga County Mut. Ins. Co.*; 3 *Hill* 508, *S. C.*; 4 *Hill* 137, *Mann* v. *Herkimer Mut. Ins. Co.*; 7 *Hill* 49, *Neavie* v. *Onondaga Co. Mut. Ins. Co.*

The election was held by inspectors, not by the directors; that inspectors permitted Durar to vote cannot affect the company. *Ang. & Ames,* § 280 and 291.

The plaintiff's right does not depend upon the by-laws, but

must depend upon the charter of the company of which he is a member.

Mr. *Whitehead,* on the same side.

The ground taken by the counsel of the plaintiff is, that the defendants are liable by implication; there is no pretence of an express contract with the plaintiff. It is not the ordinary case of a stranger suing a company for an injury; it is a claim against a mutual company, on the ground that the plaintiff is a member of the company.

The charter contains the articles of association : no one can be a member except pursuant to the sixth section; the directors cannot otherwise admit a member. There is no hardship in the case, all members are bound to know the provisions of the charter and by-laws. Durar was never a member of this company; for that he must have given security *in writing. Ang. & Ames* 300. He could come in only by consent of the directors. 2 *Cranch* 166, *Head* v. *Prov. Ins. Co.;* 13 *Conn.* 173, *Fairfield Ins. Co.* v. *Thorn; Ang. & Ames* 316, § 299.

Directors cannot go beyond power limited in the charter. 17 *Mass.* 29, *Salem Bank* v. *Gloucester Bridge Co.; Ang. & Ames* 327, § 309.

The assessment was no recognition of membership. The notice was to Cantelo, and the treasurer made the assessment upon Cantelo's note without any knowledge of the transfer; the receipt was to Cantelo, and by the case in New York, Cantelo was still liable.

The appointment of a committee to inquire into the loss cannot implicate the company. Durar made a claim; a committee was appointed to investigate it, and it turned out that he was not insured. The appointment of a committee under such circumstances does not absolve plaintiff from proving his contract. In this, as well as the voting at election, and the notice to terminate the other policies, if directors acted under a mistake, that mistake does not make Durar a member of the company.

If there is a *precedent act* which by the charter is necessary to be done to make the plaintiff a member, the directors

Durar v. Insurance Co.

cannot directly dispense with it; and no subsequent acts of acquiescence on their part, or any recognition of his membership can make him a member without it.

Mr. *Zabriskie*, for plaintiff.

The objection is, that Durar did not, upon transfer, give *his* note for the amount of premium, and did not, therefore, become a member or insured.

This is not necessary by either charter or by-laws.

1. Section 6 of charter requires every person *effecting insurance* to give his promissory note. This only applies to original insurer *effecting insurance*, not to assignee, who is provided for by section 7. This note is given before *policy received;* cannot apply to an assigned policy, whole wording of section only applies to original insurer.

2. Section 7 provides for *continuing* an assigned policy; it prescribes terms—1, application to directors in thirty days; 2, assent of directors; 3, *giving proper security*, to satisfaction of directors, for *part* of note unpaid.

Carefully avoids *giving his own note* or a new note for balance, but says giving proper *security*.

Security may be a note or bond and mortgage. It may be a pledge, stock, bond, a gold watch, a bag of gold, a bill of exchange or promissory note, as collateral—either are *security*. *Durar's* note would have been *security*, but no greater than the liability created by section 2 and section 7.

I. Did Durar give *any* security? He did; two kinds—1, he left Cantelo's note with them; he made himself liable, as a member, to assessments by sections 2 and 7.

II. Was this proper security?

Cantelo's note was taken by them on original insurance as good. All other members give notes. All charter requires is promissory note. His *personal responsibility* as member, when he became such; liability by charter to assessments was *proper* security—by-law authorizes it in mortgages.

III. Was this application to *directors?* was assignment by consent of *directors?* and was security to satisfaction of *directors?*

These are all one question; all three were done by the assent of their secretary, and were acquiesced in by them.

Two questions arise :

1. Can these acts be done by their agent ?   2. If not, is here such acquiescence as to avoid them ?

1. Corporation bound by acts of its agent.  *Angell & Ames* 174 (2d ed. 1843); 12 *Wheat.* 64, *Bank U. S.* v. *Dandridge.*

This case is a learned dissertation, by Justice Story, on the power of corporations to bind themselves by acts of agents, and what facts will raise a presumption of agency.  3 *Halst.* 182, *Baptist Church* v. *Mulford.*  Implied contracts of corporations. 7 *Cranch* 306, *Bank of Columbia* v. *Patterson.*  Court inferred the adoption, by the corporation, of a contract under seals of directors.  4 *Cowen* 645, *Perkins* v. *Wash. Ins. Co.*; 14 *Johns.* 118, *Dunn* v. *St. Andrews Church*; *Angell & Ames on Corp.* 243.

A bank acts by directors, who always have power.  It may authorize cashier by express resolution or subsequent assent. This company, by 14th section of charter, may appoint agents. By the 14th article of by-laws, the secretary is expressly made the agent of directors for receiving applications; this in section 10 of charter is directed to be made to the *directors.*  This matter being delegated to secretary, the other parts of the same transaction follow it as a consequence, else what use of *application to secretary ?*

Article 18 expressly gives secretary power to certify.

1. These directors have power to appoint agents for effecting business of company.  *Charter,* § 4.

2. Stephen H. Lutkins was their secretary, their agent—1, for effecting insurance; 2, for giving consent to transfer, and entering approval in books.

1. Article 9 of by-laws.  Consent as herein after provided (*i. e.* by-laws) implies that with it assignment good.

Article 14.  He must present policy and assignment *to secretary, not to directors, not to company.*  He may have the same ratified and confirmed, *i. e.* by secretary.

Section 7 of charter says *application to directors.*  Article

14 makes secretary their agent *for this very application* expressly.

Article 18 of by-laws gives authority in case of mortgages.

The form of consent printed on policy makes the secretary the agent of company to give this consent. *Assent* includes approval of security and confirmation. By the condition of insurance, article 10, it is not assignable without written *consent of company*. This implies that on consent it is good ; and that assent endorsed is evidence of all previous requisites being complied with, *i. e.* satisfactory *security and approval*.

They adjourn for three months, leaving the insured with *right* to assign policies, and leaving the secretary the general agent of the company, and provide no other officer to assent to assignment.

2. Acts done by the agents of a corporation, if assented to or *recognized* by them, are the acts of the corporation. This recognition is as potent as express authority. *Angell & Ames on Corp.* 246, § 304.

If a corporation ratify the unauthorized acts of its agent, the ratification is equal to a previous authority, as in the case of natural persons. *Fleckner* v. *Bank of U. S*, 8 *Wheat* 338 ; 8 *Pick.* 56, *New Eng. Ins. Co.* v. *Dewolf.*

The " act of secretary recognised by company binds it." 21 *Pick.* 270, *Hayward* v. *Pilgrim Ins. Co.*, 276.

3 *Hill* 508, *Swift* v. *Saratoga Co. Mut. Ins. Co.* 812. Assessment of loss after assignment would have *confirmed it.*

There assignment without consent was void ; but here section 7 says it shall avoid, but may be confirmed : this means void without consent.

The acts of recognition of assignment and consent are—

1. Monthly meetings for two years after assignment were recorded, with their books in which it was recorded before them.

2. The voting by *Durar's proxy* at the election, by which these directors held their seats.

3. The report of committee, entered on the minutes of the board, acknowledges not only the note, but the. *policy*, as an

existing policy, (April 14, 1848,) and recommends that it should be recorded.

4. The assessment of loss upon this note, August 16th, for fire on August 1st, and receipt of it between August 26th and September 6th, the date of fire. By article 17, by-laws, assessments are made *on members* at the time *of fire*.

5. By viewing his buildings, and calling for more detailed proofs of loss after fire.

6. By calling for *further* security on two other policies, part of same assignment, and for want of it forfeiting them by the vote of the board.

The company is bound by acts and *representations* of agent in business on which he is employed. Their secretary was agent to *certify* their consent to the transfer of policy. *Charter*, § 10; *By-laws, articles* 14 and 18. He certified that the company *did consent* to this transfer.

If he made *false minutes* the corporation are bound; if he makes *false certificate, equally bound*.

This act done *in their name* they afterwards recognise.

Notice of transfer to secretary is notice to *company*. By articles 14 and 18, assignees are required to give notice to *secretary*. He, therefore, is their proper officer.

All acts of company *after this* are done with full notice of *this transfer*, although the individual directors did not *in fact* know, or did not think of this assignment.

Garrison was treasurer in August, 1845, and authorized to receive money. He called on W. Cantelo; he told Garrison that he would send to Durar for it; he got it from Durar, and paid Garrison. The defendants *then* received money, knowing it came from Durar.

In the case of *Nally* v. *Chenango Co. Ins. Co.*, 7 *Hill* 49, there was no assignment of policy or pretence of consent to assignment. This, by their act, made the policy *void;* no claim for setting it up again. In this company, by by-laws, article 17, the assessment only on premium notes of members.

It is said that the assent of company to assignment is one thing, and the ratification of it another thing.

To this we answer—1, that the act makes consent virtually a confirmation and ratification ; 2, that the company, in article 18 of by-laws, treat it as the same thing.

Thus, we think we have shown that Durar did give security, both by leaving Cantelo's note and by his own personal liability ; that the company did assent to the assignment; and did ratify and confirm the same, both by the act of their proper agent and the continued acquiescence and repeated recognition of the directors themselves.

The CHIEF JUSTICE.   This action is brought by the assignee of a policy of insurance to recover a loss sustained by fire. The policy was originally effected by William J. Cantelo, on the 29th of June, 1843, for the term of five years.   On the 23d of October, 1844, Cantelo conveyed the property insured to Enoch Durar, the plaintiff, and at the same time assigned to Durar the policy of insurance.   On the 6th of September, 1845, within the term for which the insurance was effected, the premises were destroyed by fire.

It has not been questioned, and upon the facts disclosed in the case it must be taken as established, that the original policy of insurance was duly executed, and that in the hands of Cantelo it was a valid policy ; that the policy was assigned in good faith by Cantelo to the plaintiff in due form, so far, at least, as to conclude Cantelo, and to divest him of all interest in the policy; that the premises insured were also conveyed in fee by Cantelo to the plaintiff and that at the time of the fire they were owned by him; that there was a total destruction of the premises by fire; that the fire resulted from accident; that due notice of the loss was given by the plaintiff to the defendants; that all proper and necessary steps consequent upon the loss were taken by the plaintiff to entitle him to recover, and that the action was in due form of law.   There was an attempt, indeed upon the trial, to show that the transfer of the property was colorable only, and that the fire was the result not of accident but of design.   But the attempt signally failed, and is now adverted to only as indicating the

probable grounds upon which the defendants originally resisted the payment of the insurance.

The only question really involved in the case is, whether the policy was so assigned to the plaintiff as to constitute him a member of the company, according to its charter, and to entitle him to recover upon the policy for the loss sustained.

The defendants are incorporated as a mutual insurance company. It is ordained by the act of incorporation (section 2), "that all persons who shall insure with the said company, and also their heirs, executors, administrators, and *assigns*, continuing to be insured ·in said company, as herein after provided, shall thereby become members thereof during the period they shall remain insured by the said company, and no longer." And, by section 7, it is further ordained, "that when any property insured by the said company shall be alienated, by sale or otherwise, the policy shall thereupon be void, and be surrendered to the directors of said company to be cancelled; and upon such surrender the insured shall be entitled to receive his deposit notes, upon the payment of his proportion of all losses and expenses that have accrued prior to such surrender; but the grantee or alienee having the policy assigned to him may have the same ratified and confirmed to him, for his own proper use and benefit, upon application to the directors, and with their consent, within thirty days next after such alienation, *on giving proper security, to the satisfaction of said directors,* for such portion of the deposit or premium note as shall remain unpaid; and, by such ratification and confirmation, the *party causing such security to be given* shall be entitled to all the *rights and privileges,* and subject to all the *liabilities* to which the original party to whom the policy issued was entitled and subjected to under this act."

There are, then, prescribed by the charter two modes, only, in which an individual may in his own right, not by right of representation, become a member of the company. 1. By effecting an insurance, in which case the party insured deposits his own note for the premium. 2. By taking a transfer or conveyance of the property insured, together with an assignment

of the policy of insurance, and, within thirty days thereafter, giving proper security, to the satisfaction of the directors, for such portion of the deposit or premium note as shall remain unpaid, and having the assignment ratified and confirmed by the directors.

The plaintiff claims in the latter of these modes. The material facts disclosed by the case in support of his claim are, that the property insured having been conveyed, and the policy assigned to the plaintiff by the original policy holder, on the 23d of October, 1844, the agent of the plaintiff, on the same day, called at the office of the company, in order to have the transfer confirmed to him. The secretary of the company was then informed by the plaintiff's agent that the property insured for Cantelo had been sold to the plaintiff, who wished the insurance continued to him. The policy was produced, with Cantelo's assignment to the plaintiff endorsed upon it. The consent of the company to the assignment, printed in blank upon the policy, was thereupon filled up and signed by the secretary, in the following words: "The Hudson County Mutual Insurance Company hereby consent that the within policy of insurance be assigned by the assured to Enoch Durar, of the city of Philadelphia, this twenty-third day of October, 1844. (Signed) Stephen H. Lutkins, secretary." The secretary, then, in reply to inquiries of the plaintiff's agent, stated that the plaintiff was fully insured, and that nothing further was required of him. In the margin of the company's book of registry, there being no other transfer book, opposite to the number of the plaintiff's policy is an entry, the same as was usually made on assignments of policies, in these words: "Permitted to assign to Enoch Durar, Philadelphia, 23 October, 1844." The original premium or deposit note given by Cantelo was left with the company. No other security was given by the plaintiff. A loss having occurred by fire, about the first of August, 1845, for which the company were responsible, an assessment of two per cent. was made by the directors upon Cantelo's note, which was paid by the plaintiff. This fire occurred, and the assessment was made by the directors, and paid by the plaintiff, after the assignment by Cantelo

to him, and before the destruction of his own premises by fire. At a contested election for directors of the said company, in March, 1845, the proxy of the plaintiff, given by him as a member of the company, was voted upon. After the fire had occurred, preliminary proofs were furnished to the company by the plaintiff's agent. A bill of particulars and evidence of the amount of the loss was demanded by the company of the agent, without questioning the plaintiff's membership or right to recover.

Besides the policy in question, there were two others given by the company to Cantelo, contemporaneously with the first, upon parts of the premises conveyed by Cantelo to the plaintiff, which were all assigned at the same time and under like circumstances to the plaintiff, upon all which assessments were paid by him to the company. After November, 1845, additional security for the deposit notes given upon these policies was required of the plaintiff; and upon the plaintiff's failing to give the security required, the cancellation of the policies was entered by the secretary upon the books of the company by order of the board of directors.

It further appears in evidence that the board of directors met quarterly; but that the issuing of policies, the approval of premium notes, the assent to transfers of policies, were not formally acted upon by the board, but were intrusted to the president and secretary, as the agents of the company.

Upon this statement of the evidence, it is apparent that if the rights of the plaintiff, as a member of the company, are not complete, it is from no laches upon his part or want of recognition by the company of his rights. Immediately upon the assignment being made he gave notice of the fact to the company, and of his wish to have the benefit of the policy. The company assented to the assignment; the transfer was entered upon their books, and they informed him that nothing further was required of him. He complied strictly with the requirements made of him by the agent of the company, at their office. As a member of the company, he paid the assessments upon the original premium note; he voted as a member of the company; his membership was not questioned when

he applied for indemnity for his loss. After the fire had occurred, his rights of membership upon two policies, similarly situated, were formally recognised by the board of directors. He was required to give additional security upon them, and upon his failing so to do, the policies were cancelled by order of the directors.

But it is insisted, on the part of the defendants, that it is not in the power of the directors to waive any qualification of membership prescribed by the act of incorporation; that, by the charter, three things are essential to the completion of the assignment, viz.—1. The consent of the directors to the assignment. 2. The giving proper security by the assignee to the satisfaction of the directors. 3. The ratification and confirmation of the assignment by the directors. The soundness of these positions is admitted. The giving of the security, therefore, (as well as the consent and approval of the directors) is by the charter an essential qualification of membership. It remains to inquire whether the essential charter qualifications to constitute the plaintiff a member of the company were complied with.

1. There is no question but that the assent of the directors to the assignment was duly given. It was given by the secretary, who, in this behalf, acted as the agent and by the authority of the board, and was endorsed by him upon the policy in usual form. The company were bound by his act.

2. Was proper security given by the assignee to the satisfaction of the directors? Was any security given in contemplation of the charter? May the original deposit note given by the party originally insured be deemed the security contemplated by the charter?

The charter does not require that the assignee of a policy (as it does in case of the party originally effecting an insurance) shall give his *own note*. He is required simply to give security to the satisfaction of the directors; it may be by note, bond, or mortgage, his own paper or the paper of a third party. He is to give this security for such portion of the premium as shall remain unpaid upon the original deposit or premium note. The phraseology of the charter might convey the

impression that the security contemplated was in addition to
the original deposit note.   But the true meaning of the charter
is undoubtedly expressed in the 14th article of the by-laws of
the company, which require that satisfactory security shall be
given "for the payment of the *residue of the premium* given for
said policy."   The charter declares that upon the alienation, by
*sale* or *otherwise*, of any property insured by the company the
policy shall be void, but it does not declare void the premium
note.   The insured is entitled to receive his deposit note only
upon the surrender of the policy and the payment of his pro-
portion of all losses and expenses accrued till the time of the
surrender.   If the policy be assigned the note remains good,
unless surrendered or the maker discharged from liability by the
company.   In cases of sale, the vendor would naturally desire
to terminate his responsibility upon his premium note, and the
company (the party insured having divested himself of his real
estate insured) might often desire other and better security.   But
if the vendor be willing to continue his liability if the company
be satisfied with the security, and if the parties agree that the
original premium note shall stand as security for the balance of
the premium remaining due for the benefit of the assignee, is
there any thing in the transaction in contravention of the char-
ter?   We have seen that the charter does not require that the
assignee shall give his own note; he may give the note of any
third party, if satisfactory to the directors.   And if he may
give the note of the party originally insured, why may not the
original premium note stand as the security?   Of the liability
of Cantelo, the party originally insured, upon his note during
the continuance of the policy, there can be no doubt.   He is,
by the terms of the charter, liable on his note for all losses
accruing up to the time of the surrender of the policy.   It was
so held by the Supreme Court of New York, even where there
was no assignment, and where the fire occurred after the pro-
perty insured had been alienated.   *Neavie* v. *The Onondaga
Mut. Ins. Co.,* 7 *Hill* 49.

The by-laws of the company provide that a mortgagee may
have a policy of insurance effected by the mortgagor assigned
to him upon the security of the original deposit note, and it is

in evidence that it is customary for policies to be assigned to mortgagees precisely in the mode. that the policy was transferred to the plaintiff. It is true the *by-laws* of the company contemplate a different mode of perfecting an assignment to a mortgagee from that prescribed in case of a *sale*. But does the charter contemplate a different mode? We have seen that the charter provides but for two ways in which a person in his own right can become a member of the company, the one by being an original insurer, and the other as an assignee, "continuing" (in the language of the charter) " to be insured in said company, as herein after provided." Now there is no other mode provided by the charter in which an assignee of a policy can become a member but that prescribed in the 7th section, which in terms applies to all alienations, by *sale* or *otherwise*. It is fully conceded that this section may have been designed to apply primarily to an alienation of the *entire* interest of the. party insured. But it does clearly include by its terms alienations by mortgage, as well as by sale, conditional as well as absolute alienation. It includes all alienations by sale or otherwise.

And if assignments in case of mortgage are not made by authority of that section, by what authority are they made? The assignee of the policy can only become a member in the mode provided in the charter. No other mode is provided in the charter, except that pointed out in the 7th section; and, consequently, unless a mortgagee becomes a member by sanction and under the provision of the 7th section, he. cannot be a member or have any right to recover upon his policy. The secretary of the company testifies that the assignment of policies to mortgagees are uniformly made in the same mode adopted in the present case. The permission to assign is endorsed by the secretary upon the policy; it is entered in the books of the company; the assignor's deposit note is held as security, and, unless the directors demand further security, the interest of the assignee is perfect. No prejudice can arise to the rights of the corporation or of other insurers by holding the assignment valid. It is in the power of the directors, at any moment whenever they deem proper, to demand addi-

tional security, and if not furnished the policy may be declared void. This course was adopted by the company in regard to the other two policies held by the plaintiff. It was not done in regard to this policy. They had notice of the transfer; it was upon their own books. Their agents received the plaintiff's assessment with notice of the transfer, and the natural and legal presumption is that they were satisfied with the security of the original deposit note, and that they ratified and approved the transfer. They held the deposit as security; they consented to the transfer; they assured the plaintiff that he was fully insured, that nothing further was required of him; he voted as a member of the company; they received his money for assessment upon the premium note. Could clearer evidence be offered of the approval of the transfer by the board?

It will not be contended that a formal vote of the board was necessary for this purpose. It is enough if their assent may fairly be presumed from the acts of their authorized agent or from their own acquiescence. No such vote appears ever to have been given by the board. The evidence shows that consent to the transfer of policies and the approval of secretary was not formally acted on by the board, but was intrusted to their agent.

HAINES, J. This case comes before us upon a special verdict, and upon the facts found by the jury it is to be determined whether the plaintiff has the right by law to recover.

The action is founded upon a policy of insurance effected by the defendants to William J. Cantelo, and by him assigned to the plaintiff at the same time with the conveyance to him of the property insured.

The defendants resist the claim, upon the ground that there was no contract between them and the plaintiff; that the policy was not approved by the directors of the company, nor confirmed and ratified by the plaintiff; and that he did not give satisfactory security for the payment of the residue of the premium given for the policy.

The seventh section of the charter of the company declares,

that on the alienation of the property insured the policy shall be void, and surrendered to the directors to be cancelled; but that the grantee or alienee, having the policy assigned to him, may have the same ratified and confirmed to him for his own use and benefit, upon application to the directors, and with their consent, within thirty days after such alienation, on giving security to the satisfaction of the directors for such portion of the deposit or premium as shall remain unpaid.

The fourteenth article of the by-laws provides, that if the assignee, who shall have purchased the whole property insured, shall within thirty days after the purchase present the policy and assignment to the secretary, he may have the same confirmed and ratified to him; and when the assignment shall be approved by the directors, the secretary shall record the same, and the confirmation thereof by order of the directors, when the grantee or alienee shall have given satisfactory security for the residue of the premium given for said policy.

If the plaintiff complied substantially with the requisites of the charter and of the by-laws, and the policy was ratified and confirmed to him, the defendants are liable for the loss sustained.

The conveyance was made to the plaintiff of all the property insured on the 22d day of October, 1844, and the policy of insurance duly assigned at the same time.

On the 23d day of October, the day following, the plaintiff, by his agent, presented the policy and assignment to the secretary of the company, and informed him of the conveyance and of his desire to have the insurance continued to him. The consent of the company, printed in blank on the policy, was then filled up by the direction of the secretary, and signed by him; and on being asked if any thing more was requested of the plaintiff to have him fully insured, he answered there was not: and on being further asked if the plaintiff was fully insured, he replied that he was.

The plaintiff took possession of the property, and, by his tenants, occupied it until the 16th day of September, 1845, when the building and machinery were consumed by fire, and became a total loss.

1. The defendants insist that they are not responsible, because the directors never approved the assignment, nor ordered it and its confirmation to be recorded.

The objection is not sufficiently sustained, either by the law or by the facts, to afford a proper ground of defence.

The plaintiff had literally complied with the requisites of the charter and of the by-laws, by presenting the policy and assignment to the secretary, and procuring the endorsement of the assent of the company in the usual form. If any thing more was required in that particular, it was to have been done by the secretary. His duty it was to lay the matter before the directors, for their approval. If they disapproved, they should have informed the plaintiff to that effect, and not have suffered him to rely upon a policy which without their consent to its approval would be void. But "the register book" of the company, the only record of assignments kept by them, contains, in connection with the registry of the policy to Cantelo, the following: "Permitted to assign to Enoch Durar, of Philadelphia, 23d October, 1844." This entry, made by the secretary in the books of the company, and subject at all times to their inspection, presupposes authority to make it. Whether the record was made by order of the directors in this particular case, or in pursuance of general instructions given to him, the authority is the same, and it binds the company. *Bank of Columbia* v. *Patterson's administrators*, 7 *Cranch* 299; *Peters* v. *Washington Insurance Co.*, 4 *Cowen* 645.

It is evidence, furnished by their own record, of the confirmation and ratification of the policy, and of their consent to its assignment to the plaintiff.

2. But it is further insisted that the defendants are not liable for the loss, because the plaintiff did not give some new security for the payment of the residue of the premium.

The company had a right to require satisfactory security, by a new note or otherwise. Neither the charter nor the by-laws require them to take the note of the assignee, nor prescribe what security they should take. The charter directs that it be "proper security to the satisfaction of the directors;" the by-laws express it to be "satisfactory security." Cantelo had

made the assignment without any agreement for the cancelling of his note. It was, consequently, left in the hands of the company by his consent, and the liability upon it was never removed. If the company were satisfied with the note, that was sufficient. It was "security to the satisfaction of the directors," and within the letter and spirit of the charter.

Their agent, the secretary, acting within the scope of his authority, said that everything had been done by the plaintiff that was required of him, and his acts and declarations on that subject bind his principals.

If the proposition to assign the policy was submitted to the directors, they knew, or had the means of knowing, what security they had for the premium, and, if dissatisfied with it, should have so expressed themselves and informed the plaintiff. Their silence implies their assent. If the matter was not submitted to them, but the whole business as to assignments committed to the secretary, his assenting to this assignment, and his recording it, is evidence that he, as the authorized agent of the company, was satisfied with the security, and accepted it.

This view of the case is strengthened by the conduct of the directors themselves after the assignment. In March, 1845, one of the officers of the company procured the proxy of the plaintiff to vote for directors, in virtue of the policy; and votes were permitted to be cast upon it in two several elections, the first having been set aside for irregularity.

It is true the election was conducted by inspectors, but they were chosen, doubtless, for their impartiality as well as for their capacity; and it was their duty to see that none but members of the company voted. They acted under the authority of the directors, and upon the evidence of membership furnished by them, which was the books of the company containing the names of the members, and which the inspectors compared with the proxies.

In this transaction the plaintiff was treated as a member of the company, and consequently as a party insured.

Again, in July, 1845, when the fire occurred on the premises of Mr. Savoy, a party insured, and the loss was to be assessed

upon all the members, in proportion to the amount of their premium notes, a list of all the notes was furnished by the secretary to the treasurer, who made the assessment. On that list was a statement of the note of William J. Cantelo, given on this policy; an amount was assessed upon it, and paid by the plaintiff.

The notice of the assessment, it is true, was not directly given to the plaintiff, but was formally made out to Mr. Cantelo, and in his absence served by delivering it to his son. But this does not relieve the defendants; on the contrary it strengthens the evidence against them, for it showed that they regarded Cantelo as still liable to them, and his note as a subsisting security in their hands upon which they might assess a due portion of the losses. If the note had not been accepted as satisfactory security at the time of the assignment, they had no right to assess upon it any loss incurred after that time; and it is of no consequence whether the plaintiff was directly liable to the company for the residue of the premium or not: the note was left for their security, and they looked to that, and upon it assessed and received its due proportion of the loss. If the money assessed had not been paid, or if they had become dissatisfied with the security, they could have terminated the risk, and cancelled the policy according to the provisions of the 9th section of the charter, and as was done on two other policies between the same parties.

Again, in April, 1845, the finance committee, duly appointed by the board of directors, reported that they had examined all the premium notes that belonged to the company, and found that certain persons, and among them William J. Cantelo, on this very policy and on two others, were insured too high; and that, as to certain other policies named by them, some of the premium notes were not legal, and that on one of them additional security should be required.

Here was the report of a committee specially appointed to examine the securities directly recognising the premium note and the policy in full force and effect, and that report presented to the directors, and accepted and voted upon by them.

But the evidence against the defendants does not stop even

here. When notice of the loss in this case was given to the company, and the preliminary proofs delivered to them, they did not deny their liability, or the existence of the policy, or that the plaintiff was a member of the company, on the contrary, they acted on the supposition of a subsisting valid policy; they required a bill of the particulars and evidence of the amount of the loss, and evidence of the cost of the building and machinery. And they, moreover, appointed a committee to view the premises where the fire occurred.

At the time of the assignment of the policy, two other policies, issued by the defendants to William J. Cantelo, were assigned to the plaintiff, and the like proceedings were had upon them in relation to the assignment, confirmation, and security as upon this, and the defendants treated those as policies confirmed to the plaintiff, allowed him to vote upon them, assessed a loss upon them, and, in January, 1846, gave notice to the plaintiff to furnish further security for the premiums; and, because he declined to furnish the security required, the directors declared the risk taken upon them to be terminated and the policies cancelled.

The testimony clearly shows that there was a contract of insurance existing between the parties at the time of the loss, and I am fully satisfied that the plaintiff is entitled by law to recover, and that judgment should be entered in his favor, and against the defendants, for the amount of the damages assessed by the jury, with costs.

OGDEN, J., concurred.

Judgment for the plaintiff.

CITED in *Flanagan* v. *Cam. Mut. Ins. Co.*, 1 *Dutcher* 511; *Branin* v. *Ins. Co.*, 4 *Dutcher* 96; *Belleville Mut. Ins. Co.* v. *Van Winkle*, 1 *Beas.* 340.